# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

      Plaintiff

    vs.                                                CRIMINAL NO. 16-4134 MV

**QUANG HUY BUI,**

      Defendant

## UNITED STATES' RESPONSE TO DEFENDANT HUY QUANG BUI'S SENTENCING MEMORANDUM

The United States respectfully submits this response to Defendant Quang Huy Bui's Sentencing Memorandum (Memorandum) filed by the Defendant on September 1, 2017 (Doc. 62).

## PROCEDURAL HISTORY

Beginning in March 2016, Defendant Quang Huy Bui (Defendant) attempted to obtain and export Teledyne J402-CA-400 turbojet engines (J402) to Vietnam without an export license to do so although he knew he needed one. The J402 powers United States Harpoon anti-ship missiles and cannot be exported from the United States without a license.[1] Defendant argues that "the facts contained in the PSR cannot yield an inference that Mr. Bui intended to violate U.S.

---

[1] In his Memorandum, Defendant states that "the J402 is a small jet engine commonly used in unmanned aerial vehicles, such as drones," Doc. 62 at 4 and 9. Defendant later references his own intention for obtaining the J402 for use as part of an anti-ship missile only in terms of something that "[t]he government contends." *Id.* at 11. Defendant goes on to admit "that the Government of Vietnam intended to use the J402s in its own program for the development of unmanned aerial vehicles, including Harpoon missiles." *Id.* at 12. Thus, while Defendant never directly denies that he was fully aware that Vietnam was seeking the J402 for use in a Harpoon missile system, the overall construction of Defendant's argument may still have the unintended effect of suggesting that he may have understood that he was seeking to obtain the J402 for a less lethal application. But the facts are clear, as set forth below, that Defendant always understood that he was seeking to obtain the J402 as part of a missile weapons system, and that he later took steps to hide that fact from federal officials.

export control laws," Doc. 62 at 14, and that, although his conduct was knowing,[2] he "was unable to appreciate the importance and consequences of an unlicensed defense article export from the United States." *Id.* at 8. The United States believes that Defendant's actions prove that he had more than ample background and information to appreciate the import and consequences of the United States' export laws, which is why he knowingly violated them. In fact, there is substantial evidence that since 2013, Defendant was made aware of, yet has repeatedly ignored United States export laws. On several occasions, Defendant has attempted to export or has actually exported additional regulated defense articles relating to missiles from the United States to Vietnam.

On October 26, 2016, a federal grand jury indicted Defendant on one count of violating the Arms Export Control Act (AECA) in violation of 22 U.S.C. § 2778 and 22 C.F.R. §§ 121 and 127.1(a), and one count of Smuggling Goods from the United States in violation of 18 U.S.C. § 554.. Doc 2. Subsequently, on June 6, 2017, Defendant pled guilty to Smuggling Goods from the United States. Doc. 53. The Plea Agreement (Agreement) stipulated under Fed.R.Crim. P. 11(c)(1)(C) to a sentence of incarceration ranging between 12 months and one day to 24 months.[3] Doc. 53, ¶ 7.

On August 2, 2017, the United States Probation Office disclosed a presentence report (PSR). Both the Defendant and the government reviewed the PSR, and provided edits and comments. Upon review, the Probation Office amended and re-disclosed the PSR in its entirety

---

[2] In his plea agreement, Defendant acknowledged that he "knowingly attempted to export … from the United States … a defense article" [and that he] "knew the J402s were intended for export, and that it was against the law to do so, and [he] did so knowing the required export license … had not first been obtained." Doc. 53 at 3, ¶ 5.

[3] In the Agreement, the government agreed that if the Defendant fulfilled his obligations as delineated in the plea, the United States "will not bring any additional criminal charges against the Defendant arising out of any facts of which the United States is currently aware, including any facts forming the basis of the current indictment." Plea Agreement, Doc. 53. ¶ 14.

on September 1, 2017. Doc. 61.  The PSR[4] recommended a sentence within the range established by the Agreement.

Defendant filed a Memorandum on September 1, 2017, requesting a sentence of 12 months and one day, which is at the bottom of the agreed upon range. Doc. 62, p. 1.  For the following reasons, the United States urges this Court to impose a sentence of 24 months of imprisonment.

## ARGUMENT

The Guidelines provide a means through which a sentencing judge may determine a sentence that is "sufficient, but not greater than necessary," to achieve the sentencing goals of 18 U.S.C. § 3553.  Pursuant to this section, judges must consider certain factors when imposing a sentence.  A reasonable sentence is one that "reflect[s] the seriousness of the offense, promote[s] respect for the law, provide[s] just punishment, afford[s] adequate deterrence to criminal conduct" and protect[s] the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(B), (C); *see also United States v. Booker*, 543 U.S. 220 (2005).  The sentence should "avoid[] unwarranted sentence disparities among defendants who have been found guilty of similar conduct."

Defendant argues that factors such as his impoverished background, his claimed ignorance of the law and a later change in United States/Vietnam relations are mitigating elements that compel this Court to sentence him to the bare minimum of the range.  The United States disagrees with Defendant's assessment. Defendant is a highly educated, accomplished professional executive of a multinational corporation, who deliberately and repeatedly ignored United States law.

---

[4] All future references are to the revised PSR as disclosed on September 1, 2017.

Under the § 3553(a) factors, a sentence of 24 months' imprisonment constitutes a far more reasonable sentence.

**1. The Nature and Circumstances of the Offense**

Defendant pled guilty to smuggling goods from the United States in violation of 18 U.S.C. § 554 (Smuggling). This law prohibits (1) fraudulently or knowingly, (2) attempting to export or actually exporting, (3) any merchandise, article, or object, (4) contrary to any law or regulation of the United States. § 554.

The AECA criminalizes the unlicensed export of items the President designates "defense articles." The Act authorizes the President to require licenses for the export of such articles as well as promulgate regulations for their export. 22 U.S.C. § 2278(b)(2). By executive order, the President has delegated this authority to the United States Department of State, Directorate of Defense Trade Controls (DDTC). Under its delegated authority, the DDTC promulgates regulations, known as the International Traffic in Arms regulations (ITAR). Under ITAR, a defense article is any item on the United States Munitions List (USML) found at 22 C.F.R. § 121.1. Unless specifically exempted under the AECA and the ITAR regulations, any person who wishes to export items covered by the USML must register with the DDTC and obtain an export license from it before exporting defense articles.

Defendant pled guilty to smuggling by knowingly attempting to export one or more Teledyne J402-CA-400 turbojet engines, classified as defense articles under USML, Section 121.1, Category IIX(d). His actions were contrary to the AECA and the ITAR regulations due to the absence of the necessary export licensure or authorization from the DDTC. Doc. 62, ¶¶ 5-6. As delineated in the factual circumstances of his plea agreement, Defendant knew that his actions violated the law.

Congress has demonstrated that it views the crime of smuggling seriously by imposing a penalty of up to ten years in prison. Defendant has benefitted greatly by entering an agreement that limits his potential incarceration to no more than 24 months.

### a. *Speculating About a Different Factual Scenario Does Not Provide Mitigating Factors for Defendant's Offense*

Much of Defendant's Memorandum contends that he is entitled to a low-end sentence because he would have been entitled to a license to export the J402s had he verified that a necessary license was in place. Defendant also asserts that one of the driving factors behind the licensing requirement is to provide the DDTC information about actual exports. He concludes this argument by observing that his export would not have been counter to United States' interests due to factors such as improving relations between the United States and Vietnam. In essence, Defendant's argument is essentially "no harm, no foul."

This argument is speculative and self-serving and the Court should discount it. There are simply no facts which support the argument that a license to export the Teledyne J402-CA-400 turbojet engines would have been granted if Defendant had simply taken the time to submit his paperwork. Defendant contends that "DDTC grants a vast majority of license applications that are consistent with licensing policies," and that in 2013, only .36 % were denied.[5] These statements assume that Defendant's ostensible application would have fallen within DDTC licensing policies, and would have been comparable enough in merit to the other approved applications, such that it too would have been granted. These assumptions are on loose footing, at best. First, during the time period at issue, there is no evidence that the United States government was ever prepared or willing to authorize the export of military weapons, or the

---

[5] Consideration of a 2013 statistic must be tempered by the fact that the crime in this case occurred 3 years later.

5

components of missiles, to the Republic of Vietnam, a communist regime.[6]  Nor do Defendant's statistics speak to the fundamental dearth of information as to that question.  Rather, the fact that only .36% of applications are allegedly denied likely speaks more to the fact that such applications are submitted following substantial financial investments from the companies seeking licenses, and who, in order to secure that investment, take meticulous, painstaking care to ensure that their applications are flawless before they even begin the submission process.[7]  It may also be the case that a great many applications are returned prior to adjudication due to flaws, which are later corrected, or not, as the case may be.  We simply do not have enough data on the approval process to know, and certainly not enough to make the leap in logic that because of the claimed .36% denial rate in 2013, Defendant's desire to obtain an export license would have been approved in 2016, had he applied.  Significantly, the arms embargo against Vietnam was in place while the transaction was being negotiated, and was not lifted until long after Defendant had purchased the J402s.  Moreover, even if we make the specious assumption that an application related to Defendant's J402 transaction might have been approved, had he followed the law, the fact remains that in his own words, "(he) knew that the J402 engine was intended for export and that such export would be against the law …" PSR at ¶45.

Defendant also sought to obtain other items which were not ITAR, but instead covered under the less restrictive Export Administrative Regulations, and that application was denied.

---

[6] Additionally, calling Vietnam an "ally" of the United States, as Defendant does, is an overstatement.  Although relations have certainly improved, there is currently no official alliance between the two countries, as there is between the U.S. and Great Britain, or Japan.  Vietnam is still a heavily guarded communist regime, and the arms embargo was only *just* lifted, with applications and licenses approved on a case-by-case basis.  Indeed, the announcement that the embargo would be lifted cautioned that the move "should not be interpreted as carte blanche for weapons sales to Vietnam" and that future arms sales would be scrutinized by the U.S. to "examine what's appropriate and what's not."  See, https://www.nytimes.com/2016/05/24/world/asia/vietnam-us-arms-embargo-obama.html

[7]  EO Imaging, discussed more fully below, is a prime example, as they go so far as to employ an "export compliance expert."

PSR at ¶ 27-28.  More importantly, Defendant knowingly avoided the licensing process for the items in this case on every level, after having been advised numerous times that it was necessary to comply with the law.

### b. *Defendant Knowingly and Willfully Avoided Following U.S. Export Law and Cannot Reasonably Claim Ignorance or Mistake*

Defendant knew well that no items covered by ITAR could be exported without a license. In June of 2015, Defendant was in negotiations with EO Imaging to purchase video trackers, a.k.a. tracker boards, used in missile systems.  PSR at ¶ 20-24.  He was advised by EO Imaging that the parts "were classified as Significant Military Equipment, subject to ITAR," and that a license was required by U.S. law.  Id. at 21.  EO Imaging required Defendant to provide a signed letter stating he was in compliance with ITAR.  Defendant signed the letter on behalf of VTA, indicating he was vice president, and also stated that he wanted to obtain a license to export the missile components.  Id. at 24.  EO Imaging went on to refer Defendant to an export compliance expert and again reminded him about the export restrictions.  Id.[8]

At about the same time as Defendant was speaking to EO Imaging about ITAR-controlled items, he was also negotiating with Space Electronics to purchase a non-ITAR, "dual use" item, the KSR-6000 Center of Gravity Moment of Inertia Machine, commonly used to measure center of gravity and moment of inertia in missiles, bombs, and torpedoes.  He first advised Space Electronics that the item would be used in California, then later admitted it would be sent to Vietnam, and asked about ITAR compliance.  PSR at ¶ 27.  Space Electronics responded by backing out of the negotiations and advised they would need to go through their representative in Vietnam.  Id.  Defendant then said he would actually use the item in the U.S.,

---

[8] The discussions with EO Imaging are instructive here because they demonstrate that Defendant was advised of ITAR/U.S. export laws.  While the fact that Defendant was seeking to obtain a tracker board used in missile systems is important, the EO Imaging transaction is not otherwise part of this case.

and that it wasn't clear if the items would eventually end up in Vietnam. Id. The license was denied and no export occurred. PSR at 28. This demonstrates three key instructive concepts. First, Defendant knows the law regarding ITAR, or at the very least, he knew it existed. Second, Defendant sought to avoid having to comply with the export laws by initially falsely claiming that the item would not leave the U.S. Finally, the fact that this application for a non-ITAR, dual-use item was denied casts significant doubt on Defendant's assertion that an application to export the far more restricted J402 would have been approved.

In August of 2015, Defendant attempted to purchase a gimbal system with specifications for a missile seeker head.[9] PSR at 29. The prospective sellers advised Defendant of the ITAR and export license laws and Defendant responded that he "did not have the time to go through with an export license." Id. He instead asked that his name, and his company name be removed from all paperwork involved in the deal. Id. Such a request is not the action of someone who is who is ignorant or mistaken about the law. These actions constitute deceit, designed to hide criminal behavior. The gimbal order was never consummated, due to pricing.

In March of 2016, Defendant began negotiating with Sandia Tech[10] for the purchase of 11 Teledyne J402-CA-400 turbojet engines. These engines are used to power the United States Navy's AGM-84 Harpoon anti-ship missile, as well as the AGM-84E Standoff Land Attack Missile.[11] The J402-CA-400 is a component of a weapons system, and this is the use for which

---

[9] At risk of belaboring the obvious, there is a trend here: EO Imaging video trackers for missile systems, KRS-6000 for calibrating missiles, the gimbal with specifications for a missile seeker head, and later the J402 Harpoon missile engine.

[10] Misidentified in the PSR as Sandia Labs, the actual company name is Sandia Technical Supply, or Sandia Tech.

[11] As quoted above, Defendant indicates the Teledyne J402-CA-400 turbojet engine is "a small jet engine commonly used in unmanned aerial vehicles, such as drones." Doc. 62 at 9. This is actually not correct. While another model of engine, the J402-CA-**700** is used to power *target* drones (military drones used for targeting), the Teledyne J402-CA-**400** turbojet engines, which is the model Defendant ordered, is used for attack missile systems. See Attachment A.

8

Defendant intended to acquire the items.  Defendant completed an end user statement which stated the engines were for an "unmanned aerial vehicle" (another way of describing a drone), but he also attached a document to the very same email containing the end user statement, wherein he clearly specifies that the J402-CA-400s that he was ordering were in fact to be used in a Harpoon missile system. See Attachment B.  Thus, Defendant again engaged in deception in identifying the use for the items he wished to purchase.  The fact that Defendant falsified the end user statement means he knew was he was doing was wrong.

Furthermore, Defendant was advised in a March 22, 2016 email that the higher cost of the J402 was "based on you not obtaining the appropriate license for the first order.  I could get in trouble, so could you.  In fact, we could go to jail…"  Thus, Defendant was told in very blunt and plain terms exactly what the consequences could be if he chose not to follow the law and got caught, thereby vitiating his contention in his Memorandum that "he was unable to appreciate the importance and consequences of an unlicensed defense article export from the United States." Doc. 62 at 8.  In other words, not only can Defendant not blithely claim ignorance of the applicable export law, it is clear that he knowingly and willfully violated it.

   c. *Defendant's Assertion That The Transaction Was Licensable Is Not A Mitigating Factor*

Defendant argues that the regulations provide a mitigating factor for those transactions that "would have been authorized" with a proper request.  22 C.F.R. § 127.12(b)(3)(i).  This regulation is not applicable here.  The section Defendant cites addresses voluntary disclosure by an individual who believes that he or she may have violated provisions or regulation of the AECA or the ITAR. It applies "only when information is provided to the Directorate of Defense Trade Controls for its review in determining whether to take administrative action under part 128 of this subchapter...." 22 CFR 127.12(a).  In other words, the mitigating factor recognized by this

provision, is voluntary self-reporting. However, Defendant never voluntarily self-reported his crimes. Instead, he tried to hide them through deception. For these reasons, it is not relevant to discuss voluntary disclosures as a mitigating sentencing factor.

Defendant also argues that because the intended end-user of the export was the Vietnam Ministry of Defense, there was no possibility of diversion. This argument implies that the intended end-use of an export is a significant mitigating factor. While the government agrees that the end-use of an export can be a factor in sentencing, it is solely as an aggravating factor. Furthermore, Defendant's statements as to the future use of an export that did not occur are self-serving statements that should bear no weight in fashioning an appropriate sentence here.

### d. Whether Defendant Independently Violated the Law or Violated the Law As Part of a Joint Enterprise is Irrelevant to his Culpability

Defendant argues that he should receive a low-end sentence because he was just following orders. This amounts to an argument that his sentence should be reduced because he was a minimal participant. In § 3B1.2, the guidelines provide direction as to how to assess an individual's role in criminal activity for granting a minimal participant adjustment. Its guidance is relevant here.

Under this guideline, it is the Defendant's burden to establish entitlement to a reduction. *See United States v. Virgen-Chavarin*, 350 F.3d 1122, 1131 (10th Cir. 2003) (acknowledging that a "defendant has the burden of establishing, by a preponderance of the evidence, that he is entitled to a reduction in [his] base offense level under § 3B1.2") (*quoting United States v. Onheiber*, 173 F.3d 1254, 1258 (10th Cir.1999)). The adjustment is not warranted if the defendant's role is integral. *Id.*; *see also*, *United States v. Gonzalez*, 534 F.3d 613, 617 (7th Cir. 2006). A participant's role is not minimal if he played in active role, such as obtaining,

negotiating or selling illegal items or substances. *United States v. Virgen-Chavarin*, 350 F.3d 1122, 1131 (10th Cir. 2003).

Defendant argues that he was a pawn in a larger scheme because he just followed orders. This is again, a self-serving statement lacking factual support. Defendant had an important leadership role in Viettel's interests in the United States. Indeed, Defendant held top executive positions in what he describes as "the largest telecommunications company in Vietnam, with over 35,000 employees." Doc. 62 at 6. In that regard, Defendant was entrusted to form a subsidiary of Viettel to handle its business in the United States, the largest market economy in the world, was made vice president of one Viettel company, which gave him authority to conduct business on its behalf, and made President of another Viettel company. While doing so, he himself negotiated, purchased, and arranged for listed USML items to be sent to Vietnam in violation of United States' export laws. He was not merely a courier, or messenger, or even a mere representative, but an high-ranking corporate executive of Viettel. Although he surely acted on behalf of the company, the assertion that he played a minor role in the criminal transaction here is simply inaccurate.

### e. There is Considerable Evidence That Defendant Has Repeatedly Violated United States' Export Laws

As reported in the PSR, Defendant attempted to export or actually did export other items listed on the USML. While Defendant has not been charged with offenses in relation to these violations, which occurred in other jurisdictions, his conduct remains relevant. These incidents provide further support as to Defendant's knowledge of the illegality of his actions. On several occasions, through several individuals, and through several written statements, Defendant, a college graduate with two degrees, and a corporate executive, received clear notification of the United States' export laws. Despite these notifications, Defendant still chose to violate the law.

Additionally, in December of 2016 – after being indicted in the instant case, Defendant was still negotiating for the purchase of ITAR-controlled materials from a company called Aerotech.  In that recent instance, Defendant did ask about completing the sale legally.  (Attachment C).  But he made similar statements in the instant case, and then flatly ignored and avoided the legal means for completing the sale, despite the undercover agents telling him it was unlawful, and offering to wait for the appropriate registration and licensing so that the transaction would then be legal.  In the Aerotech negotiations, Defendant stressed that he wanted Aerotech to handle licensure and registration, which is exactly what he initially did in the case before this Court, until he became impatient and pursued unlawful means for acquiring the J402s.  Although that activity has since ceased, it must be weighed when formulating an adequate sentence in this case, especially in light of Defendant's presenting himself as a well-intentioned naïf, who was simply ignorant of the law and/or its consequences.

### f. *Defendant's Cooperation After Indictment Is Not Material*

Finally, Defendant argues that his cooperation with his company's internal investigation after the indictment should be a material factor when determining his sentence.  However, Defendant's persistence in seeking to obtain ITAR-controlled materials even after indictment would seem a far more pertinent consideration.  Moreover, while the United States Attorney's Office understands that Viettel could potentially face tremendous economic repercussions from other agencies of the government as a consequence of the fact that one of their high officials was caught seeking illegally export a jet engine for a Harpoon missile, that process is apparently ongoing.  The outcome as yet is uncertain.  Indeed, in actuality, this Court has little information upon which to form any opinion whatsoever about the quality of cooperation Defendant alleges he provided to Viettel in connection with its internal investigation.  Nor, for that matter, does the

Court have any meaningful basis for assessing the quality of any claimed cooperation that Viettel contends that it provided to other parts of the government. One thing is certain, however, and that is that none of the alleged cooperation occurred until *after* Defendant was arrested. Given that fact, it is equally likely that any cooperation Defendant claims he provided to Viettel was motivated by an effort to safeguard his future prospects after this case is over, rather than to atone to the government of the United States for his criminal conduct.

Moreover, Defendant has already reaped considerable benefit under the terms of his plea agreement. First, the entire plea agreement, including the three-level adjustment Defendant received for acceptance of responsibility, was formulated in recognition of any cooperation Defendant may have provided. Without that adjustment, Defendant would be facing a guidelines range of 63 to 78 month, almost triple the range he now faces. In addition to the three-level adjustment, the government agreed to drop any further prosecution based on its knowledge of the Defendant's conduct prior to this smuggling crime or bearing on this smuggling crime. Defendant is not entitled to any further adjustments.

 2. **The History and Characteristics of the Defendant**

In his Memorandum, Defendant describes his impoverished childhood, a lack of training and an eagerness to succeed as factors that warrant a sentence on the lower end of the scale. None of these factors supports a lower sentence.

While the government is without any information concerning the poverty Defendant experienced growing up and so will presume it true, a difficult childhood does not take Defendant out of the heartland of what many other defendants have experienced in childhood. In contrast to many other defendants who have appeared before this Court, there is every indication

that Defendant had food, shelter, and familial support.  Significantly, Defendant, unlike many others, also had access to higher education and corporate training and experience.

Defendant is a highly educated man with numerous achievements.  He has degrees in Foreign Languages and Economics from the University of Hanoi.  These degrees indicate more than the Defendant's knowledge.  They also demonstrate his intelligence, initiative and his ability to operate within the rules and regulations of an institution.

Since 2007, he has worked for Viettel.  This company recognized Defendant's achievements by giving him significant responsibilities and promotions.  Not only did Defendant form a business entity in the United States known as VTA Telecom Corporation (VTA), but he functioned as its President.

Although the company Defendant formed, VTA, states it did not train him in import-export laws, this fact is immaterial.  This is because it is clear that Defendant knew the basic fact that exporting the J402 was a crime and that he could be sent to jail if he got caught trying to do so.  Indeed, prospective sellers alerted Defendant to the pertinent export laws numerous times.  In any event, it was Defendant's duty and responsibility as an executive of the company to avail himself of the appropriate information he needed to conduct business lawfully.  Clearly, as indicated by his advanced degrees, he had the ability to do so.

Most significantly, in his Agreement, Defendant acknowledged his responsibility and his knowing violation of the United States' laws and regulations.  He cannot now divorce himself from responsibility for his actions. The Court should sentence him in consideration of his advantageous educational background and his deliberate indifference to the rules and regulations of this country.

### 3. The Need for the Sentence Imposed to Promote Respect for the Law, Provide Just Punishment, Adequate Deterrence and to Protect the Public from Further Crimes of the Defendant

Defendant has not shown respect for United States law. Since 2013, he has engaged in a series of unlawful exports. The exportation of items in violation of United States laws and regulations implicate national security concerns that can have serious consequences for United States citizens. Although the maximum punishment for a smuggling offense is ten years, the maximum punishment for an AECA offense is twenty years for each violation. A sentence of 24 months is appropriate and very reasonable.

### 4. The Need to Avoid Unwarranted Sentencing Disparities Between Defendants Who Have Committed Similar Crimes

Defendant spends much time discussing the *Cai* case, also recently prosecuted in this District. Because the facts are so different, *Cai* is ultimately irrelevant. Cai involved two cousins exporting electronic parts to China, to make money as an independent financial venture. Neither of the two young men was a top executive of a major company. Indeed, Wentong Cai was a doctoral student at the University of Illinois. Defendant, by contrast was exporting weapon components to Vietnam while employed by a company run by the Vietnamese Ministry of Defense. There is substantial support for the argument that Bui's actions were actually *more* egregious than the Cais.

The more significant reason *Cai* should not be considered is that it is a random sample of a single case, with disparate facts and circumstances, and many open questions about such issues as the contents of the presentence reports, the factors that may have led the government to the plea agreement it made, or the reasons the Court decided to impose the sentences it ultimately imposed. If we consider the outcome in *Cai*, shouldn't we also consider the case of Syed Vaqar Ashraf, who was sentenced to 37 months' imprisonment on September 1, 2016 for conspiracy to

15

export gyroscopes? On November 2, 2016, Richmond Akoto, of North Carolina, also received a 37-month sentence for smuggling firearms and ammunition to Ghana, having purchased the items at local stores and gun shows. Firearms and ammunition, rather than an engine for a Harpoon missile were purchased from stores, yet he is serving a 37-month term of imprisonment. Also on September 2, 2016, in the District of New Jersey, Kirby Santos received 24 months imprisonment for participating in a conspiracy to smuggle mere *parts* of firearms to the Philippines. Or should we compare Bilal Ahmed, who was sentenced on June 30, 2015, to 24 months' imprisonment in the Northern District of Illinois? Mr. Ahmed pleaded guilty to violating IEEPA and attempted smuggling of one thermal imaging camera to Pakistan. A camera, not a weapon component for destroying ships, resulted in a 24-month sentence. No, we should not look to any of these cases for guidance in fashioning Defendant's sentence. They, like the *Cai* case are factually distinct, and do not serve as useful touchstones. Rather, the guidelines should aid the decision here. The guidelines say that Defendant should be sentenced much higher than his agreed-upon range. Thus, 24 months is well within the range of fairness. Considering Defendant's knowledge of the illegality of his act, combined with the persistent deceit he employed, and his repeated attempts to acquire the goods described above, 24 months is a very reasonable sentence.

## CONCLUSION

WHEREFORE, the United States respectfully requests that this Court impose a sentence of 24 months of imprisonment.

<div style="text-align: right;">
Respectfully submitted,

JAMES D. TIERNEY
Acting United States Attorney

*Electronically filed*
JON STANFORD
</div>

                                                            Assistant United States Attorney
                                                            P.O. Box 607
                                                            Albuquerque, NM 87103
                                                            (505) 346-7274

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification to defense counsel of record.

*Filed Electronically*
JON STANFORD
Assistant United States Attorney